AO 106 (Rev. 04/10)  Application for a Search Warrant

**FILED**

FEB **1 0** 2020

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
One white Apple iPhone
IMEI: 354868092333543

)
)
)
)
)

Case No.  2 0 M J 0 6 1 8

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-1, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B-1, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 31 USC 5332 | Bulk cash smuggling |

The application is based on these facts:

See attached Affidavit of Special Agent Matthew Smith

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Matthew Smith, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __2/7/2020__

_____
*Judge's signature*

City and state:  San Diego, CA

Hon. William V. Gallo
*Printed name and title*

**AFFIDAVIT**

I, Matthew Smith, a Special Agent with the United States Department of Homeland Security - Homeland Security Investigations, having been duly sworn, depose and state as follows:

**INTRODUCTION**

1. This affidavit supports an application for warrants to search the following electronic devices:

   a. One white Apple iPhone, IMEI: 354868092333543 **(Target Device #1)**;

   b. One SIM Card, IMID: 8901260713157858758 **(Target Device #2)**;

   c. One Samsung cellular phone, IMEI: 359620100985698 **(Target Device #3)**; and

   d. One black Apple iPhone, IMEI: 357336091985926 **(Target Device #4)**

(collectively, "**Target Devices**"), as further described in Attachments A1-A4, and to seize evidence of crimes, specifically violations of Title 31, United States Code, Section 5332, as further described in Attachments B-1 through B-4. The requested warrant relates to the investigation and prosecution of Iris GARCIA and Esteban MERCADO ("Defendants") incident to their arrest for bulk cash smuggling on January 15, 2020. At the time of their arrest, GARCIA was the driver and MERCADO was the passenger of a 2014 Chrysler Town and Country minivan bearing California license plate 8NYD106. The **Target Devices** are currently in the possession of the Department Homeland Security (DHS), 880 Front Street, Ste. 3200, San Diego, CA 92101.

2. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the Target Device, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

//

//

**BACKGROUND AND EXPERIENCE**

3.     I am a Special Agent (SA) with Homeland Security Investigations (HSI) and have been employed by HSI since October of 2018.   My duties include conducting investigations regarding the illicit trafficking, importation and distribution of bulk U.S. currency.   I have successfully completed twelve weeks of the Criminal Investigator Training Program (CITP) and fourteen weeks of HSI Special Agent Training (HSI-SAT) both at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia.  My training included the use of cellular and digital telephones, and other electronic devices used by narcotics smugglers during their illicit activities.  I have received training on how to conduct investigations regarding narcotics trafficking, violations of U.S. Customs laws, and the Controlled Substance Act; as defined within Title 21 of the United States Code.  I have conducted multiple criminal investigations into violations of federal and state law including, but not limited to, bulk cash smuggling, contraband smuggling, narcotics trafficking, and organized criminal activity. Currently, I am assigned to a money laundering task force.

4.     Prior to my employment with HSI, I was employed as a full-time sworn federal agent with the United States Border Patrol since February 2008.  I also completed the United States Border Patrol (USBP) law enforcement training academy, which was twenty-two weeks of training at FLETC in Artesia, New Mexico.

5.     Based upon my training and experience as a law enforcement officer, I am familiar with the ways in which bulk currency smugglers and narcotics traffickers conduct their business.  During the course of my duties, I have (a) worked as a case agent, directing specific financial and drug-related investigations; (b) worked as a surveillance agent who observed and recorded movements of individuals suspected of trafficking bulk cash and drugs; (c) participated in the execution of search warrants related to financial and drug investigations; (d) initiated and executed numerous arrests for financial and drug-related offenses, including Bulk Cash Smuggling into or out of the United States; and (e) interviewed criminal defendants, witnesses, and informants in furtherance of

2

1  investigations into the illegal smuggling of bulk cash and trafficking of controlled
2  substances. Through these duties, I have gained a working knowledge and insight into the
3  operational habits of bulk cash smugglers, drug traffickers and those associated with the
4  smuggling subculture.

5     6.      Through the course of my training, investigations, and conversations with
6  other law enforcement personnel, I am aware that it is a common practice for bulk cash and
7  narcotics smugglers to work in concert with other individuals and to do so by utilizing
8  cellular telephones to maintain communications with co-conspirators in order to further
9  their criminal activities.  This is particularly true in cases involving large quantities of bulk
10 cash. Typically, load drivers engaged in smuggling bulk cash across the border from the
11 United States into Mexico are in telephonic contact with co-conspirators immediately prior
12 to and following the crossing of the load vehicle, at which time they receive instructions
13 when to cross the border, and, in some cases, where to retrieve the vehicle which will be
14 used in the smuggling event.  Bulk cash smugglers and their organizations use cellular
15 telephones, in part, because these individuals believe law enforcement is unable to track
16 the phone numbers of calls placed to and from cellular telephones.

17    7.      Based upon my training and experience and consultations with law
18 enforcement officers experienced in bulk cash smuggling and drug trafficking
19 investigations, and all the facts and opinions set forth in this affidavit, I submit the
20 following:

22       a.      Bulk cash smugglers will use cellular telephones because they are
                 mobile, and they have instant access to telephone calls, text, web, and
23               voice messages;

25       b.      Bulk cash smugglers will use cellular telephones because they can
                 actively monitor the progress of their illegal cargo while the
26               conveyance is in transit;

3

c.   Bulk cash smugglers and their accomplices will use cellular telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations;

d.   Bulk cash smugglers will use cellular telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo;

e.   Bulk cash smugglers will use cellular telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings; and

f.   The use of cellular telephones by smugglers tends to generate evidence that is stored on the cellular telephones, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

8.   Subscriber Identity Module (SIM) Cards also known as subscriber identity modules are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

9.   In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of financial investigations, and the opinions stated below are shared by them. Further, I have personal knowledge of the following facts, or have had them explained to me by persons mentioned in this affidavit. This statement is made in support of an application for a warrant to search a cellular telephone that is believed to contain evidence of violations of 31 U.S.C. § 5332.

10.   Because this affidavit is being submitted for the limited purpose of establishing probable cause to obtain a search warrant, it does not contain all the information known to federal agents regarding this investigation.  Instead, it contains only those facts believed to be necessary to establish probable cause. In addition, information

4

contained in this affidavit is based upon reviews of official reports and records, upon conversations with other HSI Special Agents, and my personal observations and knowledge. When the contents of documents or statements of others are reported herein, they are reported in substance and in part unless otherwise indicated.

**FACTS SUPPORTING PROBABLE CAUSE**

11.     On January 15, 2020, at approximately 5:30 p.m., Iris GARCIA ("GARCIA") a United States Citizen, and Esteban MERCADO ("MERCADO"), also a United States citizen, approached the outbound inspection booths at the San Ysidro, California Port of Entry.  GARCIA was the driver of a charcoal 2014 Chrysler Town and Country minivan ("the vehicle") bearing California license plate 8NYD106.  MERCADO was the front seat passenger.  The vehicle is registered to a third-party in San Diego, California.  Three days prior, on January 12, 2020, the third-party crossed the vehicle via the San Ysidro, California Port of Entry.   During an inspection, an officer located a non-factory compartment in the floor of the vehicle.

12.     A Customs and Border Protection Officer ("CBPO") assigned to outbound operations encountered GARCIA and MERCADO.  Both provided identification showing they were U.S. citizens.   Both provided negative customs declaration.   The CBPO explained that having $10,000.00 USD or more is legal, if they declare the full amount. GARCIA claimed to have $300.00 USD and MERCADO claimed to have $307.00 USD. GARCIA also stated that they were coming from Riverside, California and were heading home to Tijuana, Mexico.  The CBPO referred the vehicle for further processing.

13.     While in the secondary inspection area, a CBPO screened the vehicle with a Currency and Firearms Detection Dog (CFDD) and received a positive alert.   A closer inspection of the vehicle revealed 23 packages of U.S. currency concealed within a non-factory compartment located under the front passenger's seat.   The total amount of currency was later determined to be $690,680.00 USD.

14.     At approximately 8:00 p.m. on the same day, I arrived at the Port of Entry and initiated an investigation.  Upon my arrival, CBPO's turned over **Target Device #1** as

5

property of GARCIA.  GARCIA subsequently confirmed to me that **Target Device #1** belongs to her.  Officers also turned over **Target Device #3** and **Target Device #4** as property of MERCADO.  MERCADO confirmed to me that he is the owner of **Target Devices #3** and **#4**.

15.     During an additional search of the vehicle, I discovered a SIM card (**Target Device #2**) in the vehicle's center console.  I photographed and seized **Target Device #2** as evidence.  It is believed that **Target Device #2** may either belong to one of the Defendants, or it may have been left there by someone who previously used the vehicle.

16.     A check for historical crossing data revealed that on December 10, 2019, GARCIA and MERCADO crossed from Mexico into the United States through the San Ysidro Port of Entry as the driver and passenger of the same Chrysler vehicle.  At that time, the vehicle had a different license plate.  Between October 2019 and their arrest on January 15, 2020, GARCIA and MERCADO crossed the border from Mexico into the United States in five different vehicles, as well as via pedestrian lanes.

17.     Based upon my training, experience, and consultations with law enforcement officers experienced in bulk cash smuggling investigations, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications (such as WhatsApp or Facebook), photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone.  Specifically, searches of cellular telephones of individuals involved in the bulk cash smuggling may yield evidence:

   a.     tending to indicate efforts to import/export bulk currency into or out of the United States;

   b.     tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the import/export of bulk currency into or out of the United States;

c.   tending to identify co-conspirators, criminal associates, or others involved in the import/export bulk currency into or out of the United States;

d.   tending to identify travel to or presence at locations involved in the import/export of bulk currency into or out of the United States;

e.   tending to identify the user of, or persons with control over or access to, the Target Devices; and/or

f.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

18.   Based upon my experience and investigation in this case, I believe that Iris GARCIA and Esteban MERCADO are involved in bulk cash smuggling activities. Based upon my experience and training, consultation with other law enforcement officers experienced in bulk cash smuggling investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the bulk cash smuggling activities of GARCIA and MERCADO, such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of **Target Devices**.

19.   I also know that smuggling conspiracies require detailed and intricate planning to successfully evade detection by law enforcement. In my professional training and experience, this requires planning and coordination in the days and weeks and often months prior to the event. Additionally, co-conspirators are often unaware of the subject's arrest and will continue to attempt to communicate with the subject after the arrest to determine the whereabouts of their valuable cargo. Based on my training and experience, individuals involved in bulk cash smuggling and other criminal activity are often involved for weeks and months prior to the day of their arrest.

20.   In this case, GARCIA and MERCADO were arrested driving a vehicle where $690,680.00 was concealed in a secret compartment. GARCIA and MERCADO confirmed that they are the owners of **Target Devices #1**, **#3**, and **#4**. Additionally, **Target Device #2** was later found in the center console of the vehicle where a secret compartment

7

with cash had been discovered.  Defendants previously crossed into the United States from Mexico in the same vehicle on December 10, 2019, and had crossings in several different vehicles.  Because **Target Devices** were promptly seized during the investigation of GARCIA and MERCADO's trafficking activities, and have been securely stored, there is probable cause to believe that evidence of illegal activities committed by GARCIA, MERCADO, and their co-conspirators continues to exist on **Target Devices**.  Given those facts, I respectfully request permission to search the **Target Devices** for data beginning on October 15, 2019, approximately 3 months prior to the arrest in this case, and up to and including January 16, 2020, the day after Defendants were arrested.

## METHODOLOGY

21.    It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and serial number, the nature and types of services to which the device is subscribed, and the nature of the data stored on the device.  Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must

8

1    inspect the device manually and record the process and the results using digital
2    photography. This process is time and labor intensive and may take weeks or longer.

3        22.    Following the issuance of this warrant, I will collect the subject
4    cellular/mobile telephone and subject it to analysis. All forensic analysis of the data
5    contained within the telephone and its memory card(s) will employ search protocols
6    directed exclusively to the identification and extraction of data within the scope of this
7    warrant.

8        23.    Based on the foregoing, identifying and extracting data subject to seizure
9    pursuant to this warrant may require a range of data analysis techniques, including manual
10   review, and, consequently, may take weeks or months. The personnel conducting the
11   identification and extraction of data will complete the analysis within ninety (90) days,
12   absent further application to this court.

13   **PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

14       24.    Law enforcement has not previously attempted to obtain the evidence sought
15   by this warrant.

16   //
17   //
18   //
19   //
20   //
21   //
22   //
23   //
24   //
25   //
26   //
27   //
28

9

## CONCLUSION

25.    Based on all of the facts and circumstances described above, there is probable cause to believe that a search of **Target Devices** will yield evidence of violations of Title 31, United States Code, Section 5332.  Accordingly, I request that the Court issue warrants authorizing law enforcement to search the items described in Attachments A1-A-4 and seize the items listed in Attachments B-1 through B-4 using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Special Agent Matthew Smith
Homeland Security Investigations

SUBSCRIBED and SWORN to before me this _____7_____ day of February, 2020.

Honorable William V. Gallo
United States Magistrate Judge

10

## **ATTACHMENT A-1**

PROPERTY TO BE SEARCHED

The following property is to be searched:

One white Apple iPhone, IMEI: 354868092333543 **(Target Device #1)**

currently in the possession of Department Homeland Security, 880 Front Street, Ste. 3200, San Diego, CA 92101.

## ATTACHMENT B-1

### ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephone described in Attachment A-1 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone for evidence described below. The seizure and search of the cellular/mobile telephone shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of October 15, 2019, up to and including January 16, 2020:

        a.    tending to indicate efforts to import/export bulk currency into or out of the United States;

        b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers– used to facilitate the import/export of bulk currency into or out of the United States;

        c.    tending to identify co-conspirators, criminal associates, or others involved in the import/export bulk currency into or out of the United States;

        d.    tending to identify travel to or presence at locations involved in the import/export of bulk currency into or out of the United States;

        e.    tending to identify the user of, or persons with control over or access to, the **Target Device #1**; and/or

        f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 31, United States Code, Section 5332, Bulk Cash Smuggling into or out of the United States.